IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAMON L. McCLINTON,<br><br>                    Plaintiff,<br><br>vs.<br><br>ANDREW M. SAUL,[1] Commissioner<br>of the Social Security Administration,<br><br>                    Defendant. | 8:18-CV-598<br><br><br>MEMORANDUM AND ORDER |

The plaintiff, Damon L. McClinton, filed his complaint (filing 1) seeking judicial review of the Commissioner's denial of his application for disability insurance benefits, and moved this Court for an order reversing the Commissioner's final decision. Filing 13. The Commissioner filed his motion to affirm the agency's final decision denying benefits. Filing 17. The Court finds that the Commissioner's decision is not supported by substantial evidence on the record, that the plaintiff's motion to reverse should be granted, and that the Commissioner's motion to affirm should be denied.

## I. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff alleges that on August 28, 2016, just a few days short of his fifty-first birthday, he became unemployable because of his seizure disorder. Filing 10-5 at 2. The plaintiff had worked in the residential construction trade, primarily as a framing and finish carpenter, but later in his career as a

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration and will be automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

construction site superintendent. Filing 10-6 at 16-22. He reports having four years of college and vocational training in construction. Filing 10-6 at 7. In 2012, the plaintiff suffered a significant closed head injury in a motor vehicle accident. Filing 10-7 at 2. His injury was described as an occipital cranium fracture and intraparenchymal hemorrhage with encephalomalacia of the right temporal lobes. He received treatment from Creighton Hospital, and when he recovered, he was discharged without any rehabilitation services.

Shortly after discharge from Creighton Hospital, the plaintiff suffered his first grand mal seizure.[2] The plaintiff's next reported grand mal seizure occurred September 4, 2014, and was witnessed by the plaintiff's roommates. A computerized tomography (CT) scan taken of the plaintiff's head on this occasion showed encephalomalacia of the lateral inferior cortex and subcortical white matter of the right occipital lobe. Filing 10-7 at 7. The plaintiff was given a Dilantin prescription to help control future seizures, and advised to follow up with a neurologist. *Id.* The plaintiff, however, neither filled his Dilantin prescription, nor followed up with a neurologist. Filing 10-2 at 2.

The plaintiff began working for All Purpose Utilities as a construction superintendent and carpenter in 2013. His employer offered employee health insurance, but did not cover the entire cost of the annual premium until the employee had participated in the insurance plan for ten years. The plan

---

[2] Grand mal, or generalized tonic-clonic seizures, are characterized in the tonic phase by the loss of consciousness and sudden muscle contractions resulting in a fall to the ground. The tonic phase gives over to a clonic phase characterized by rhythmic muscle contractions, which give the appearance of convulsive movements, before slowing and eventually stopping. A period of disorientation, referred to as postictal confusion, often follows the seizure. Fatigue and sleepiness are commonly experienced following the postictal period. http://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms-causes/syc-20363458.

provided that in an employee's first year, the employee would be responsible for ninety percent of the premium cost and the employer would cover the remaining ten percent. Filing 10-2 at 67. In the employee's second year, the employee/employer cost-share went to 80/20, and so on until in year ten, the employer covered the employee's entire premium cost. *Id.* The plaintiff said he could not afford to participate in his employer's health insurance plan because he had child support obligations for two children. Filing 10-2 at 66.

The plaintiff's next documented grand mal seizure occurred while he was at work on August 12, 2015. Filing 10-7 at 11-15. This event was witnessed by coworkers who saw the plaintiff fall and hit his head, opening about an inch-long scalp laceration. The seizure itself lasted for several minutes. The plaintiff was taken to the Midlands Hospital emergency room where he was described as somewhat postictal. The emergency room physician reported that the plaintiff had previously been in the emergency room for a seizure in September 2014, and also reported that the plaintiff had not complied with the recommendation of a neurology follow-up and had not filled the Dilantin prescription given to him in 2014. The plaintiff was again told to follow up with a neurologist, and was also given a prescription for a different anticonvulsant, Keppra.

On April 20, 2015, the plaintiff was evaluated by Dr. Bernadette Hughes, of Omaha Neurological Clinic, Inc. Filing 10-7 at 2-5. Dr. Hughes noted that the plaintiff had two previous emergency room visits following grand mal seizures, and that he has not been compliant with past treatment and evaluation recommendation. Dr. Hughes also reported that the plaintiff was "a self-pay" and did not participate in employer-provided health insurance because he pays child support for two children. Filing 10-7 at 2. Dr. Hughes' diagnosis was epilepsy and recurrent seizures, most likely the result of his

traumatic brain injury. Filing 10-7 at 3. Dr. Hughes prescribed a thirty-day supply of Keppra, 500 milligrams, to be taken twice daily. The plaintiff was instructed that he was not allowed to drive in the State of Nebraska until he was seizure-free for three months. Filing 10-7 at 4. Finally, Dr. Hughes recommended additional testing once the plaintiff obtained health insurance, which, according to Dr. Hughes, the plaintiff promised to obtain through his employer.

Dr. Hughes referred the plaintiff for an electroencephalograph (EEG), which was performed on October 20, 2015. Filing 10-7 at 44. The evaluation was reported as normal, no focal lateralizing or epileptiform features, but noted that a single EEG cannot rule out epilepsy and the findings should be correlated with the plaintiff's clinical presentation. The plaintiff saw Dr. Hughes again on December 2, 2015, at a general neurology clinic sponsored by the Nebraska Medical Center. Filing 10-7 at 45-47. She repeated much of the plaintiff's medical history in her patient note, and again reported that the plaintiff did not have health insurance and that he has not been able to fill the prescriptions he was given due to limited finances. Dr. Hughes acknowledged that the plaintiff had an EEG done since she last saw him, which she described as unremarkable. Filing 10-7 at 46. She reported reviewing a MRI of the plaintiff's brain that showed mild to moderate global volume loss more typical than his age, and multifocal gliosis in the right temporal and occipital lobes, which appeared to represent multifocal diffuse axonal injury in the frontal lobes bilaterally.

Dr. Hughes' impression was that it was likely the plaintiff has complex partial seizures, generalized.[3] She was critical of the plaintiff for not refilling

---

[3] Complex partial seizures are common in people who had a stroke or head injury. During a seizure, the individual may suddenly stop what they are doing and stare off into space. The

the Keppra she had previously prescribed. Filing 10-7 at 46-47. She reported that the plaintiff did well until his prescription ran out on November 26, and he did not refill it. She recognized the plaintiff's difficult financial condition and that he had applied for financial assistance through the University. She encouraged him to use "GoodRX.com coupons." Dr. Hughes also reported that the plaintiff's story changes regarding his personal and family histories, but she did not identify any aspect of the plaintiff's description of his seizure condition that had changed.

The plaintiff suffered another witnessed grand mal seizure at work on May 26, 2016. Filing 10-7 at 10. Emergency services were called, and the plaintiff was taken away by ambulance. The seizure was reported to have lasted for two minutes, and that the plaintiff was postictal with the rescue squad. The emergency room physician attributed this seizure to the plaintiff's noncompliance with medication. Filing 10-7 at 17. The plaintiff was again referred for follow-up with Dr. Hughes.

Dr. Hughes reported seeing the plaintiff on June 28, 2016, at the Nebraska Medical Center General Neurology Clinic. Filing 10-7 at 47. Dr. Hughes noted that the plaintiff's last grand mal seizure was May 28, observed by a jobsite supervisor, and that it lasted for a couple minutes. Dr. Hughes also reported that the plaintiff's symptoms included complex partial seizures where he has periods of time when he sits down and has some automatistic-type behaviors. Dr. Hughes reported again that the plaintiff had not been compliant with taking the anticonvulsive medication that had been prescribed in the past, and had not followed through with obtaining assistance that may have

---

seizures usually last between thirty seconds and two minutes, and the individual may be confused and tired afterwards. The individual may not remember having the seizure. https://www.webmd.com/epilepsy/complex-partial-seizure.

been available to help him with the cost of his medication. Filing 10-7 at 48. But Dr. Hughes also noted that the plaintiff had been taking Keppra since his May 28 grand mal seizure event, and that he had been seizure-free since that time. Finally, Dr. Hughes reported releasing the plaintiff back to work as long as he did not drive or operate dangerous equipment. Filing 10-7 at 42.

According to the plaintiff, he reached an agreement with his employer to stop working because of his seizures. Filing 10-2 at 44. The plaintiff's supervisor told him he was a great employee, but he was going to hurt himself or someone else because of his seizures. Filing 10-6 at 34. His last day of work with All Purpose was August 28, 2016. The plaintiff believed that he was still employable and applied for over 100 jobs after leaving All Purpose. But when the prospective employer asked why the plaintiff left his old job, he would disclose his seizure condition. After this disclosure, no prospective employer called back. Filing 10-6 at 34. The plaintiff also applied for unemployment benefits, again believing he could still work. Filing 10-2 at 60. When those benefits ran out on April 27, 2017, the next day the plaintiff applied for Social Security disability insurance. Filing 10-5 at 2, 10.

The plaintiff began receiving medical services from the Douglas County Department of General Assistance Clinic in May 2017. The initial clinic intake note indicated that the plaintiff was now homeless. Filing 10-8 at 2. The plaintiff gave a description of his seizure history and said that he had been seizure-free for a while, but thinks he had a seizure last week. The clinic provided the plaintiff with a thirty-day Keppra supply and a prescription authorizing four refills. Filing 10-8 at 7. The plaintiff was asked to return to the clinic within two weeks to have his Keppra level checked, which he did. Filing 10-8 at 15.

On September 28, 2017, the plaintiff was found on the ground outside the Wentworth Apartments. Filing 10-7 at 55. The plaintiff was taken by ambulance to the Bergan Mercy Medical Center emergency room. The initial assessment reported that the plaintiff was confused at the scene and upon arrival at the emergency department. He had an inch-long laceration to his forehead that was cleaned and closed with three stitches. Filing 10-7 at 57-58. The plaintiff was also given 1,000 milligrams of Keppra intravenously.

The plaintiff returned to the Douglas County Clinic on October 12, 2017, to renew his Keppra prescription and to have his stitches removed. Filing 10-8 at 15. Dr. Kevin Reagan examined the plaintiff. Dr. Reagan's patient note described the plaintiff's medical history and detailed the plaintiff's report of his September 28 emergency room visit. Dr. Reagan questioned the plaintiff's consistency with taking his medications and wanted to follow up with the plaintiff regarding his medications in two weeks. Filing 10-8 at 14. The plaintiff reported back to the Clinic on October 26, November 9, and November 20 for medication reviews, blood pressure checks, and a flu shot on November 9. Filing 10-8 at 12-14.

The plaintiff's November 20 visit concerned a blood pressure check and a blood draw to see whether his Keppra level was within the therapeutic range. Filing 10-8 at 12. The progress note indicates that the plaintiff was fine during the blood draw, but afterwards the plaintiff was not responding to the medical staff, but just had a blank stare. He was given some water, a banana, and 1,000 milligrams of Keppra. Dr. Reagan noted that the plaintiff gradually became more responsive over the next thirty minutes. Dr. Reagan and the clinic staff would not allow the plaintiff to, on his own, take the bus back to where he was staying. The plaintiff gave the staff permission to contact a friend who came to the clinic and picked him up. The lab report dated November 22 showed that

the plaintiff's Keppra level was below the therapeutic range. Filing 10-8 at 17. According to the plaintiff, he was told that his Keppra level was probably low because his metabolism was eating the Keppra up as fast as he could take it. Filing 10-2 at 56. On November 27, Dr. Reagan increased the plaintiff's Keppra from one 500 milligram tablet twice a day, to three 500 milligram tablets in the morning and two tablets at night. Filing 10-8 at 12.

The plaintiff was rejected when he next returned to the clinic on December 26, because his authorization for services had lapsed. Filing 10-2 at 56-57; filing 10-8 at 11. The plaintiff reapplied and was then seen in clinic on January 22, 2018. During the time that the plaintiff was not authorized for services, he ran out of Keppra. Once he was reauthorized, his Keppra prescription resumed at the increased dosage Dr. Reagan had ordered in November. The plaintiff had blood drawn on February 20 for another therapeutic level check, and now his Keppra level was within the therapeutic range. Filing 10-8 at 16.

## 2. ADMINISTRATIVE HEARING

A hearing before an Administrative Law Judge (ALJ) was held on May 30, 2018, in which the plaintiff and a vocational expert were the only witnesses. The vocational expert was not present at the hearing, but testified without objection by telephone conference. Filing 10-2 at 37. The hearing opened with the plaintiff's counsel identifying what he considered to be the main issues, which were whether the plaintiff's seizures would require him to miss work on a frequent basis or require unscheduled breaks, and whether the level of Keppra that he is required to take causes problems with fatigue. Filing 10-2 at 36-37.

The plaintiff's counsel argued that the agency's initial determination that the plaintiff was not disabled was based on his alleged noncompliance with prescribed medication, which since May 2017 was no longer true. *See* filing 10-2 at 37-38. The plaintiff admitted that he did not do everything he could to get his seizures under control when he was working. Filing 10-2 at 66. However, since May 2017, when the plaintiff started receiving care from Dr. Reagan at the Douglas County Clinic, he has been compliant with his prescribed Keppra. Filing 10-2 at 38. The plaintiff also said that since Dr. Reagan adjusted his Keppra dosage, he has consistently taken his medication as prescribed. Although he continues to have blackout seizures, he now has very few grand mal seizures. Filing 10-2 at 52.

The plaintiff said that Keppra made him very tired. Filing 10-2 at 57. He currently takes three Keppra tablets in the morning around 8:00 a.m., and two around 6:00 p.m. Filing 10-2 at 58. After taking Keppra in the morning he was drowsy, and after taking his evening tablets, he is usually asleep by 8:00. The plaintiff said that his doctor was concerned about the amount of Keppra he was taking because he has only one kidney, having donated a kidney to a friend before his traffic accident and brain injury. Filing 10-2 at 60; filing 10-8 at 2.

The plaintiff said he experienced two types of seizures. Filing 10-2 at 53. One was what he called a grand mal seizure—where he would totally lose consciousness, and according to witnesses, his body would flail, jerk and stiffen. The second seizure was what the plaintiff called a blackout—where he would appear to be wide awake but staring at something that was not there. He said both seizures would last for about two to three minutes, and he would be very disoriented when he came out of the seizure. He also said that he felt very drained after a seizure and would have to sleep for maybe two to three hours, depending on the type of seizure. Filing 10-2 at 54. The plaintiff

estimated that it took four to six hours to totally recover from a seizure. Filing 10-2 at 55.

The plaintiff provided a written statement indicating the dates he experienced seizures from September 2016 to July 3, 2017. Filing 10-6 at 26. The plaintiff also provided calendars for the years 2017 and 2018, with dates circled or crossed out, that he said showed the days on which he experienced seizures. Filing 10-2 at 48-50; filing 10-6 at 62; filing 10-8 at 19. The plaintiff represented that his seizure list was made as the seizures occurred. Filing 10-6 at 26. The plaintiff's documents indicate that between September 2016 and April 2018 inclusive, the plaintiff generally experienced two to six seizures in a given month. The most seizures the plaintiff experienced in a month was eight in January 2018. The plaintiff said that now most of his seizures were the blackout type. Filing 10-2 at 64-65.

The plaintiff said that he has been homeless since he left his last job. Filing 10-2 at 58. He spends much of the day in a Ralston city park and in the Ralston library. Filing 10-2 at 59-60. During the winter, he slept on a couch in an apartment complex garage that was used to store furniture tenants left behind when they moved or were evicted. Filing 10-2 at 59. During the day he tries to stay away from others in a "protected place" so that if he has a grand mal seizure, an ambulance would not be called. Filing 10-2 at 63. The cost of an ambulance was something he could not afford.

The plaintiff testified that he has not been employed or done any work for anyone whatsoever since August 2016. Filing 10-2 at 43. The decision to stop working was a joint agreement with his employer for his safety and for the benefit of the company. When he had a seizure on the job, an ambulance would be called, and he would go to the hospital emergency room for evaluation. Usually the treating doctor would take him off work—sometimes

for as long as a month. The plaintiff estimated that for the eight months in 2016 when he worked for All Purpose, he missed two months due to seizures. Because he was an hourly employee, he was not paid for his time away from work. Filing 10-2 at 44-45.

The plaintiff testified that he did not believe he would be of any benefit to a company because of his seizures. Filing 10-2 at 61. He would not be at his full potential and would be a danger to himself and other employees. Sooner or later, he would have a seizure, pass out, and end up in an ambulance. Filing 10-2 at 62. The plaintiff said that normally he will detect a strange chemical smell, which is a warning that a seizure is about to occur. Filing 10-2 at 51. When he gets the warning, he can quickly sit down and prepare himself so that he doesn't fall. But when there is no warning, he can drop anywhere.

The ALJ posed the following hypothetical to the vocational expert. Assume a worker with the plaintiff's past relevant work history, who did not have any exertional limits, and was able to perform work that did not require exposure to hazards such as work at unprotected heights, work near dangerous, unguarded, moving machinery, or operating motor vehicles. Filing 10-2 at 70. The vocational expert said that such worker would be unable to perform the plaintiff's past relevant work as a construction supervisor. The vocational expert was then asked whether there would be an occupational base for such worker apart from such worker's past relevant work. Filing 10-2 at 71. The vocational expert said yes, and identified three jobs in the medium, unskilled category existing in the national economy—a commercial cleaner, a dishwasher or kitchen helper, and a housekeeper. Filing 10-2 at 71.

The plaintiff's counsel asked the vocational expert her opinion whether that same occupational base would be available if the hypothetical worker would miss four days of work per month because of seizures. Filing 10-2 at 71.

The vocational expert said that specific situation is not covered in the Dictionary of Occupational Titles, but based on her background and experience, she believed that missing four days per month would not allow for any full-time, sustained work in any occupation. Filing 10-2 at 71-72. The vocational expert was asked to opine on an employer's tolerance for missing work in a month. She said missing two days in a month for an illness would not be a problem, but consistently missing two or three days every single month would probably lead to an employer discontinuing the worker's employment. The plaintiff's counsel next asked the vocational expert to consider the ALJ's hypothetical employee, but who would also have to take unscheduled breaks for four to six hours a day, four times a month. Filing 10-2 at 72-73. The vocational expert said that if it were a consistent issue every month, it would not allow for sustained, full-time employment. Filing 10-2 at 73.

### 3. ALJ'S FINDINGS AND CONCLUSIONS

On July 23, 2018, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 10-2 at 13 & 28. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act and that the plaintiff had not engaged in substantial gainful activity since August 28, 2016, the plaintiff's alleged onset date. Filing 10-2 at 18.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of

impairments that significantly limits the physical or mental ability to perform basic work activity. *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006). The ALJ found the following severe impairments: seizure disorder and residuals of brain injury. The ALJ also found that the plaintiff suffered from hypertension, but that this condition was not severe, had been managed with medication, and did not affect the plaintiff's ability to perform basic work-related activities. Filing 10-2 at 19.

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales,* 465 F.3d at 894. The ALJ acknowledged that the plaintiff did not contend that his impairments met or medically equaled a listing. Filing 10-2 at 19. Still, the ALJ went ahead and evaluated the medical evidence in reference to listing 11.02 (epilepsy, documented by a detailed description of a typical seizure). The ALJ found that the plaintiff's conditions did not meet or equal the listing criteria because the medical evidence did not establish that the plaintiff's seizures occurred at the frequency required by the listing.

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales,* 465 F.3d at 894. Without elaborating, the ALJ accepted the vocational expert's opinion that the plaintiff was unable to perform any of his past relevant work as a carpenter or construction supervisor. Filing 10-2 at 26.

At step five, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform considering the claimant's residual functional capacity, age, education, and

work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Gonzales,* 465 F.3d at 894. The ALJ concluded that the plaintiff's ability to perform work at all exertional levels was compromised by non-exertional limitations. Filing 10-2 at 27. Those non-exertional limitations were included in the ALJ's hypothetical to the vocational expert: limit exposure to work hazards of unprotected height, proximity to dangerous, unguarded, moving machinery, and the operation of motor vehicles. Filing 10-2 at 23. The ALJ determined that based on his age, education, work experience and residual functional capacity, the plaintiff retained the capacity to perform the requirements of at least medium exertional, unskilled occupations that existed in significant numbers in the national economy. Filing 10-2 at 27. In so doing, the ALJ found the testimony of the vocational expert persuasive regarding the medium and light duty jobs identified at the hearing.

On September 19, 2018, the Appeals Counsel notified the plaintiff that it had received his request for review of the ALJ's unfavorable decision. Filing 10-2 at 8-9. On October 26, the Appeals Counsel denied the plaintiff's request for review. Filing 10-2 at 2-4. The ALJ's July 23, 2018, decision is now the final administrative order.

## II. STANDARD OF REVIEW

This Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." *Id.* The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Id.* The Court will not reverse an

administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court defers to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and substantial evidence. *Boettcher v. Astrue,* 652 F.3d 860, 863 (8th Cir. 2011).

## III. DISCUSSION

### 1. THE PLAINTIFF'S CREDIBILITY REGARDING THE INTENSITY, PERSISTENCE, AND LIMITING EFFECTS OF HIS SEIZURE SYMPTOMS

The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but the plaintiff's claims concerning intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. Filing 10-2 at 20. Consistent with *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1998), when assessing a plaintiff's credibility regarding subjective complaints, an ALJ must consider the plaintiff's prior work history; daily activities; duration, frequency and intensity of symptoms; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel,* 167 F.3d 1191, 1196 (8th Cir. 1999). Using the *Polaski* factors, a plaintiff's subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Bryant v. Colvin,* 861 F.3d 779, 782 (8th Cir. 2017).

The Court finds that the portions of the record cited by the ALJ in support of his conclusion regarding intensity, persistence and the limiting effects of the plaintiff's seizure symptoms is not supported by good reasons and

substantial evidence. Specifically, the evidence cited by the ALJ in support of his conclusion does not fairly or accurately demonstrate material inconsistencies in the evidence as a whole implicating the plaintiff's credibility. The ALJ identified six instances where he believed the plaintiff's claims and testimony was inconsistent with the evidence.

First, the ALJ concluded that the plaintiff's condition was not as severe as he alleged because prior to May 2017, the plaintiff failed to comply with treatment recommendations or follow through with medical advice. Nor did the plaintiff seek treatment for his seizure condition prior to May 2017. Filing 10-2 at 23. The record reflects that prior to May 2017, the plaintiff consistently did not take prescribed anticonvulsant medication, or even fill the recommended prescriptions. He also did not participate in his employer's health insurance plan. In this regard, substantial evidence supports the ALJ's conclusion that the plaintiff was not receiving regular medical care, treatment, or evaluations for his seizure condition. But it does not necessarily follow that this finding supports the ALJ's conclusion that the plaintiff's condition was not as severe as he alleged.

Regarding the plaintiff's claimed noncompliance with prescribed medication and health insurance coverage, Dr. Hughes' reports show that the plaintiff believed he could not afford the cost of the prescribed medications, or afford the cost of participation in his employer's health insurance plan, in part, because of his child support obligations. Filing 10-7 at 2, 4, 42, 45, 47-48. A disability claimant's limited financial resources, resulting in a failure to take prescribed medication, does not require disbelief of the claimant's subjective complaints. *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661, 663 (8th Cir. 1990); *Tome v. Schweiker,* 724 F.2d 711, 714 (8th Cir. 1984).

The ALJ noted that the plaintiff did not follow through with Dr. Hughes' suggestion that he apply for assistance. Filing 10-2 at 23. When that suggestion was made, the plaintiff had a full-time job and was eligible for employer-sponsored health insurance. There is no indication that the plaintiff would have received charitable assistance of any kind at that time given his employment circumstances. However, in May 2017, after his employment had ceased and his unemployment insurance benefits ran out, the plaintiff did apply for assistance from Douglas County. Since that time, the record reflects that he has received medical care at the Douglas County General Assistance Clinic, and he has been compliant with all treatment recommendations. But his seizure symptoms persist.

Similarly, the plaintiff's inability to afford the cost of prescription medication and insurance indicates that he could also not afford the cost of self-pay regular physician visits. On the two occasions that the plaintiff suffered grand mal seizures at work, his employer covered the cost of the emergency room visits. Filing 10-2 at 67. On the other occasions when he was taken to the emergency room following a witnessed grand mal seizure, the plaintiff was responsible for the cost of the ambulance and emergency room, which he said was around $2,000—an amount he could not afford. Filing 10-2 at 63.

Also, regarding the ALJ's concern about the plaintiff's lack of regular medical treatment, the record indicates that prior to May 2017, the plaintiff's lack of health insurance coverage prevented Dr. Hughes from ordering the studies she thought might benefit the plaintiff. Filing 10-7 at 4, 42. Further, on the occasions when he was taken to emergency rooms following witnessed grand mal seizures, the medical records indicate that the treatment the plaintiff actually received did not address any acute seizure symptoms.

Instead, time would pass, the plaintiff's postictal symptoms of confusion and fatigue would clear, and he would be released. The plaintiff submitted to studies such as X-rays, CT scan, EKG, EEG, and CBC to determine whether his brain injury had worsened, or whether another condition was responsible for the seizure symptoms, but this testing did nothing to address the acute seizure symptoms that brought the plaintiff to the emergency room.

In any event, the plaintiff's inability to avail himself of regular medical care prior to May 2017 due to his financial circumstances is not evidence suggesting that his seizure symptoms are not now as severe as he alleged. The evidence is that since May 2017, the plaintiff has received regular medical care from the Douglas County Clinic, and he has been compliant with all treatment recommendations—but his seizure symptoms persist. There is substantial evidence that the plaintiff's seizure condition is severe enough to impact his participation in the competitive labor market and warrant consideration beyond the minimal workplace limitations posited by the ALJ in his hypothetical to the vocational expert.

Second, the ALJ concluded that the plaintiff's claims regarding the frequency of his seizures was inconsistent. Filing 10-2 at 23. But the ALJ's findings in support misapprehend the record. The ALJ represented that the medical record from the plaintiff's May 17, 2017, evaluation reported that the plaintiff claimed, "he had been 'seizure free for a while' until the week before, when he thought he had a seizure," which the ALJ believed was inconsistent with the plaintiff's seizure calendar. *Id.* But the ALJ did not fully present the May 17 medical record. The verbatim May 17 report is: "He said he was seizure free for while & he think he had one last week b/c he bit his tongue." The plaintiff's seizure calendar indicates that he was seizure free for a while in 2017—between February 24 and March 14—and shows a seizure on May 3,

18

which was two weeks before his May 17 appointment. Filing 10-6 at 62. Thus, contrary to the ALJ's conclusion, the medical report did not indicate that the plaintiff said he was seizure free immediately before his May 17 visit—he said he was seizure free for a while sometime prior to his visit, but his seizures had started up again. The plaintiff's report is consistent with his seizure calendar. The ALJ's conclusion is not supported by good reasons or substantial evidence in the record as a whole.

The ALJ reported that at the plaintiff's February 2, 2018, medical visit, he claimed having "two episodes" since his last visit on January 22, but the plaintiff's seizure calendar indicated six seizures during this period. Filing 10-2 at 23. The ALJ apparently misread the progress note. On February 2, the evaluation primarily concerned restarting the plaintiff on lisinopril, the medication the plaintiff had taken in the past for hypertension. Filing 10-8 at 10. The progress note indicates that he had "two episodes" is in connection with the evaluation and treatment of the plaintiff's hypertension. Although the plaintiff had blood drawn to check his Keppra level, there is nothing in this progress note or treatment plan that references the plaintiff's seizure condition, or that Dr. Reagan evaluated the plaintiff for something other than hypertension.

The ALJ was critical of minor inconsistencies between the plaintiff's 2017 seizure calendar, and his report of seizures in 2017. In his seizure report, the plaintiff indicated two seizures in both January and April, but in the 2017 seizure calendar, the plaintiff reported four seizures in each month. Over all, the plaintiff's seizure report and calendars track his seizures between January 2016 and April 2018. During that timeframe, the plaintiff recalled experiencing either 83 or 79 seizures. The seizures that the plaintiff described as blackouts are often not remembered. *See supra* at n3. The difference noted

by the ALJ—four out of eighty-three recorded events—is hardly material and does not impact the plaintiff's credibility. Substantial evidence and good reasons do not support the ALJ's conclusion that the plaintiff's seizure report and calendars are materially inconsistent, and adversely impact the plaintiff's credibility regarding his seizure history.

Third, the ALJ concluded that the plaintiff's testimony regarding post-seizure symptoms was inconsistent. Filing 10-2 at 23. But again, the ALJ appears to misunderstand the record. Because the plaintiff is unconscious during a seizure, his testimony about his seizures, in part, comes from what witnesses have told him. Filing 10-2 at 53. The plaintiff testified that during grand mal seizures, he loses consciousness, stiffens up, and his body flails or jerks. During petit mal, or what the plaintiff called blackout seizures, he seems to be wide awake, but is non-responsive and appears to be staring at something that is not there. Both seizures would last for two to three minutes, and he would be very disoriented when he came out of it. The plaintiff said the seizures were very draining to the point that all he could do was sleep for two to three hours. He estimated that it would take four to six hours to totally recover from a seizure, depending on whether it was a grand mal or blackout seizure. Filing 10-2 at 54.

The plaintiff's testimony is entirely consistent with the medical records. Dr. Hughes reported that the plaintiff's witnessed grand mal seizure in August 2015 lasted "a minute or so," and the seizure in May 2016 lasted "for a couple minutes." Filing 10-7 at 45, 47. The emergency room record from the plaintiff's August 2, 2015, seizure reported that the plaintiff's witnessed grand mal seizure lasted several minutes. Filing 10-7 at 31. That same record reported that the plaintiff was somewhat postictal when assessed by the emergency room physician. Id. Also regarding the August 2015 witnessed seizure, Dr.

Hughes reported that the plaintiff was postictal for ten to twenty minutes. Filing 10-7 at 45.

The ALJ incorrectly concluded that the witnesses to the plaintiff's November 20, 2016 blackout seizure did not document any postictal effect. Filing 10-2 at 23. Dr. Reagan's progress note documented that the plaintiff experienced a period of non-responsiveness, began responding to yes/no questions after about five minutes, and that over the next thirty minutes the plaintiff's responsiveness increased until he was back to normal. Filing 10-8 at 13. Dr. Reagan noted that the plaintiff did not want the rescue squad called. Also, Dr. Reagan would not allow the plaintiff to take the bus back to where he was staying. Instead, a friend was called who agreed to come pick the plaintiff up.

The ALJ stated that the plaintiff told medical providers in May 2017 that he was back to normal after a few minutes. Filing 10-2 at 23. In fact, the medical provider actually just reported the plaintiff's description of only the blackout portion of a seizure. "He said when he gets seizure its more likely feels 'blank' for few minutes then back to normal." Filing 10-8 at 2. If the plaintiff had actually said his seizure from beginning to end lasted just a few minutes, that statement would be inconsistent with all the other medical documentation in the record, and indicate minimization, not embellishment, of his symptoms. When the record as a whole is considered, substantial evidence and good reasons do not support the ALJ's conclusion that the plaintiff's claims regarding post-seizure symptoms were inconsistent.

Fourth, the ALJ found that the plaintiff's description of daily activities was inconsistent with his complaints of "disabling symptoms and limitations." Filing 10-2 at 23. The ALJ found that the plaintiff spent his day walking in the park and reading in the library, and that he could do his own laundry and shop.

True, but the plaintiff is not claiming that his symptoms are physically disabling or impose disabling physical limitations. The plaintiff's counsel made it clear at the start of the hearing that the plaintiff's claim concerned his capacity to function consistently on a daily basis. Filing 10-2 at 37. The ALJ did not focus on the relevant question. A disability inquiry must focus on the claimant's ability "to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang v. Apfel,* 205 F.3d 1084, 1086 (8th Cir. 2000).

The plaintiff's account of his daily activities is not inconsistent with a disabling seizure disorder. *See Tate,* 167 F.3d at 1196-97; *Flanery v. Charter,* 112 F.3d 346, 349-50 (8th Cir. 1997). The plaintiff possessed the physical capacity to do much, if not all, of his past relevant work, notwithstanding his seizure disorder. The concern represented by the ALJ's residual functional capacity finding was to limit exposure to certain environmental hazards in the plaintiff's prospective workplace. But the ALJ's hypothetical did not account for the obvious disruption that the plaintiff's seizures would cause in a competitive work setting. Although the frequency at which the plaintiff claimed he experiences seizures does not physically incapacitate him from doing all that he could do before his employment ended, the question the ALJ failed to address was the extent to which the frequency of the plaintiff's seizures could be accommodated in the workplace. *Flanery,* 112 F.3d at 350 ("These episodes may not be totally disruptive in a home environment, but could hardly be accommodated in the workplace"). The plaintiff's description of his daily activities is not inconsistent with his disability claim and the record as a whole.

Fifth, the ALJ noted that the plaintiff did not have reported income between 2009 and 2012. From this, the ALJ concluded that the plaintiff's

"earnings record does not allow for an inference that he would be working if not for his health." Filing 10-2 at 24. The Court observes that the plaintiff's vocation was a carpenter and that he worked in the residential construction field. This country suffered an historic financial downturn beginning in 2008 that devastated the residential construction industry. The plaintiff was not the only unemployed, or underemployed, carpenter during the years 2009 to 2012. The ALJ's conclusion regarding the plaintiff's earning record is unwarranted, and not supported by substantial evidence and good reasons.

Finally, the ALJ found that the plaintiff's receipt of unemployment compensation benefits after his employment with All Purpose ended in August 2016 indicates that he was asserting that he was "willing, able, and ready to return to work." Filing 10-2 at 24. The ALJ is right that the plaintiff believed he was employable after All Purpose let him go in 2016. But no one would hire him. The plaintiff reported applying for over 100 jobs. However, when he was asked why he left his former employment and whether they could talk to his former employer, he disclosed his seizure condition, and gave the prospective employer permission to speak with his former employer, but then never received a call back from any of the prospective employers. Filing 10-6 at 34.

A claimant does not need to be completely bedridden to be considered disabled. *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991). Although a claim for unemployment insurance benefits may be facially inconsistent with a claim for disability insurance benefits, such claims are not always factually inconsistent. *See Spencer v. Bowen*, 798 F.2d 275, 278 (8th Cir. 1996). The plaintiff testified that he applied for jobs after he left All Purpose because he was in denial that something was wrong with him. He now realizes that he will always miss work because of his seizure disorder, and that he presents an

unacceptable risk for an employer regarding harm to himself and other employees. Filing 10-2 at 60-62.

The medical record supports the plaintiff's beliefs. His grand mal seizures while on the job understandably prompted coworkers and witnesses to call for emergency medical services. The cost of the plaintiff's ambulance transport and emergency room care was borne by his employer. The plaintiff testified that he would be taken off work for a month or more. Filing 10-2 at 45. When the plaintiff experienced a blackout seizure following a blood draw at the Douglas County Clinic, the record indicated that he was not fully responsive for at least thirty-minutes. He was given a large dose of Keppra and not allowed to take the bus, by himself, back to where he was staying. Filing 10-8 at 12-13. The average non-medical employer would hardly be capable of handling a similar situation when—not if—the plaintiff experienced a petit mal seizure at that employer's workplace. The plaintiff believed he could work, but it is easy to see why all but the most specialized employer would be unwilling to take a chance by hiring him.

The ALJ's determination regarding the plaintiff's credibility with respect to the intensity, persistence, and limiting effects of his seizure symptoms is not supported by good reasons and substantial evidence. *Boettcher*, 652 F.3d at 863. Further, the plaintiff's description of the intensity, persistence, and limiting effects of his seizure symptoms is consistent with the medical evidence in this record as a whole. *Bryant,* 861 F.3d at 782.

The plaintiff reported that he recorded his seizures as they occurred on his seizure calendars. Filing 10-6 at 26. Those calendars show that since May 2017, when the plaintiff began receiving services from the Douglas County Clinic, the plaintiff has experienced between three and six seizures in a month. The longest interval the plaintiff went without a seizure was around two

weeks. Filing 10-6 at 62; filing 10-8 at 19. The plaintiff testified that his grand mal symptoms have diminished since he began receiving regular care from the Douglas County Clinic, and he has been able to consistently obtain Keppra and have his daily dosage significantly increased. Filing 10-2 at 52-53. Now, the plaintiff's seizures are primarily what he described as the blackout kind—like what he experienced at the Douglas County Clinic on November 20, 2017. Filing 10-8 at 12-13.

The ALJ needed to address the plaintiff's present capacity for the competitive and stressful workplace conditions found in the real world. *Tang, 205 F.3d at 1086*. And that determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Brown v. Barnhart,* 390 F.3d 535, 539 (8th Cir. 2004). Thus, it was incumbent on the ALJ to make findings regarding the frequency, persistence and limiting effects of the plaintiff's seizure symptoms. Instead, the ALJ seemingly rejected any notion that the plaintiff's seizures had a limiting effect on his capacity to participate, day in and day out, under the conditions in which real people work in the real world. *Tate,* 167 F.3d at 1196-97. Because no such finding was made, the record in this matter is significantly underdeveloped. *See Smith v. Barnhart,* 435 F.3d 926, 930 (8th Cir. 2006).

## 2. THE WEIGHT AFFORDED TO MEDICAL OPINIONS

The plaintiff argues that the ALJ's determination that the opinions of his treating physician, Dr. Kevin Reagan, was only somewhat persuasive, is not supported by substantial evidence on the record as a whole. Filing 14 at 12. The Court agrees. The primary justification the ALJ sited for his conclusion was that Dr. Reagan's opinions were mostly based on his patient's reports. But, a patient's history, or reports of subjective complaints, is an essential

diagnostic tool, and a physician must necessarily rely on a patient's description of their subjective complaints. *Flanery,* 112 F.3d at 350.

An ALJ is not free to disregard subjective complaints merely because there is no other evidence supporting the patient's claim, but subjective reports may be discredited if there are inherent inconsistencies or other circumstances that cause the ALJ to question the reliability of the claimant's report. *Twyford v. Commissioner, Social Security Administration,* 929 F.3d 512, 517-18 (8th Cir. 2019). "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski,* 739 F.2d at 1322; *Bryant,* 861 F.3d at 782.

The ALJ discounted Dr. Reagan's responses on the agency's seizure medical source statement regarding the frequency of the plaintiff's seizures, and the number of days per month that the plaintiff is likely to be absent from work as a result of his seizures. Filing 10-2 at 25. However, Dr. Reagan's responses were both internally consistent, and not inconsistent with the plaintiff's statements and testimony, as well as not inconsistent with the medical evidence regarding seizures symptoms generally. Dr. Reagan believed that on average the plaintiff experienced four seizures per month and that he would be absent from work four days per month. Filing 10-7 at 50, 53. The plaintiff's seizure calendars show that since May 2017, which is when the plaintiff began treating with Dr. Reagan, he experienced between three and six seizure per month. Filing 10-6 at 62; filing 10-8 at 19.

The ALJ questioned the credibility of the plaintiff's seizure frequency claims because of a discrepancy in two out of the twenty months that he kept track of his seizures. That discrepancy—whether the plaintiff experienced 79 or 83 seizures over a 20-month period—was hardly a material consideration when assessing the plaintiff's credibility. It is more likely than not that the

plaintiff's seizure frequency is actually underinclusive. The Midlands Hospital emergency room physician, Dr. Richard Alarid, reported that the plaintiff did not recall any of what happened that day before finding himself in the emergency room. Filing 10-7 at 31. Dr. Hughes reported that the plaintiff does not have a recollection of his seizures. Filing 10-7 at 47. It is hardly surprising that the plaintiff's blackout seizures would be amnesic, and that his capacity to accurately remember and record each and every seizure would necessarily be underinclusive.

If the ALJ believed that the plaintiff's seizure reports were inaccurate, it was his duty to develop the record to show that the plaintiff's claims were inconsistent with the medical or other evidence. *Smith,* 435 F.3d at 930. None of the physicians who treated the plaintiff questioned the fact that the plaintiff experienced grand mal and petit mal seizures. Nor could they. Contemporaneous medical records document medical personnel witnessing both kinds of seizures. The ALJ did not seek to question Dr. Reagan, or other any treating physician, or any of the agency physicians, regarding the credibility of the plaintiff's seizure frequency claims.

The ALJ was also critical of Dr. Reagan's opinion that on average the plaintiff may miss about four days of work per month because Dr. Reagan did not describe what he thinks would prevent the plaintiff from going to work. Filing 10-7 at 53. However, what the ALJ characterized as Dr. Reagan's opinion, was actually just Dr. Reagan's checkmark next to a box on a form provided by the agency. The question on the form asked Dr. Reagan to "estimate, on the average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment." Thus, the agency's question supplied the explanation the ALJ believed was missing—the

plaintiff's absence from work was to be the result of his impairments or treatment. The form did not request any further explanation from Dr. Reagan.

The ALJ disputed Dr. Reagan's response regarding the plaintiff's postictal symptoms. Dr. Reagan indicated that the plaintiff experienced postictal symptoms of confusion, severe headaches and exhaustion, that these symptoms lasted for two to three hours after a seizure, and that the plaintiff would need to rest for four to six hours after a seizure. Filing 10-7 at 51. The ALJ discounted Dr. Reagan's response because it appeared to be based on the plaintiff's subjective complaints, and because there was no documentation in the Douglas County Clinic records regarding "such extensive postictal symptoms." Filing 10-2 at 25.

Again, the ALJ may discount the plaintiff's subjective complaints, but only if they are inconsistent with the evidence as a whole. *Bryant* 861 F.3d at 782. The record in this matter is not inconsistent with Dr. Reagan's response. The emergency room records indicated that the plaintiff presented as confused, both at the scene and in the emergency room. *See* filing 10-7 at 31, 55. These same records indicated that the plaintiff spent nearly three hours in the emergency room before being released. Dr. Reagan observed and documented one of the plaintiff's blackout seizures on November 20, 2017. Filing 10-8 at 13. Dr. Reagan reported that the plaintiff was not responsive, but after approximately five minutes, began responding to his name and yes/no questions. Over the next thirty minutes, the plaintiff's awareness increased until it was back to normal. Still, Dr. Reagan did not allow the plaintiff to take a bus back to where he was staying, but had the staff call someone to come and pick the plaintiff up. Substantial evidence and good reasons do not support the conclusion that Dr. Reagan's response regarding the plaintiff's postictal symptoms was inconsistent with the evidence as a whole.

Instead of relying on the responses from Dr. Reagan, the plaintiff's most recent treating physician, the ALJ found the opinions of the state agency reviewing physicians persuasive. Filing 10-2 at 24. Even if the ALJ's conclusions regarding Dr. Reagan are not supported by substantial evidence, or inconsistent with the record as a whole, the ALJ may still rely on the opinions of the agency physicians if those opinions are supported by substantial evidence. If substantial evidence supports the outcome resulting from the ALJ's conclusions, then that outcome will not be reversed, even if substantial evidence supports a different result. *Stormo v. Barnhart*, 377 F.3d 801, 805 (8th Cir. 2004).

The Court, however, finds that the agency physicians' opinion regarding the plaintiff's noncompliance with medical treatment recommendations, and findings regarding the plaintiff's workplace limitations, are not supported by substantial evidence. The agency physicians uniformly accepted the analysis and conclusions provided by the agency's disability examiner. The disability examiner concluded that the plaintiff was not disabled, and that his seizures were due to noncompliance issues. Filing 10-3 at 5. She recommended that the plaintiff's employment should be limited by seizure precautions only, and that no other significant limits were necessary. From this, the ALJ concluded that the plaintiff had no exertional limitations, and only non-exertional limitations of no work that requires exposure to hazards such as unprotected heights, or work near dangerous, unguarded, or moving machinery, or work that required operating motor vehicles. Filing 10-2 at 19.

The disability examiner and agency physicians' reports do not consider whether the plaintiff's deemed noncompliance was the result of his inability to afford the cost of medical treatment and prescription medication. *Tang*, 205 F.3d at 1086 ("[I]nability to afford medication cannot be used as a basis for

denial of benefits"). Nor did the ALJ make a finding regarding whether the plaintiff's reported noncompliance with the prescription medication treatment recommendations was deliberate, or because of an inability to afford the medication. Further, no treating physician or agency physician opined that the plaintiff's seizure symptoms would be alleviated or significantly controlled if he had been compliant with treatment recommendations prior to May 2017. *Tate,* 167 F.3d at 1198 (substantial evidence did not support benefits denial when no medical evidence supported a finding that the claimant's seizures would actually be controlled by medication).

Significantly, the disability examiner and agency physicians were unaware of the plaintiff's treatment beginning May 2017. The evidence is undisputed that when the plaintiff began receiving services from the Douglas County Clinic in May 2017, he was able to consistently obtain Keppra, and was compliant with taking his seizure medication. In fact, the clinic's records show that Dr. Reagan significantly increased the plaintiff's daily Keppra dosage to 2,500 milligrams, from Dr. Hughes' initial prescription of 1,000 milligrams, in order to achieve a therapeutic level of Keppra in the plaintiff's blood. *See* filings 10-8 at 7, 16-17. Notwithstanding the fact that the plaintiff has been compliant with seizure medication since May 2017, he continues to experience seizures, with the only difference being that he now has very few grand mal seizures, but more blackout seizures.[4] Filing 10-2 at 52.

Finally, likely in reliance on the disability examiner and agency physicians' view that no other significant limitations were necessary, the ALJ failed to consider the plaintiff's capacity to consistently function in the

---

[4] The agency physicians were also unaware of the plaintiff's September 28, 2017, emergency room visit when he was found down on the ground at an apartment complex following a grand mal seizure. Filing 10-7 at 55-65.

workplace. *Brown,* 390 F.3d at 539 ("the ALJ's determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace"). The medical evidence documenting the plaintiff's emergency room visits and the petit mal seizure he suffered at the Douglas County Clinic, demonstrate the disruption that results from a seizure. The plaintiff's uncontradicted testimony that he currently experiences three to four seizures per month does not render the plaintiff incapable of doing any work whatsoever, but the issue not addressed by the ALJ's hypothetical is whether the disruption resulting from the plaintiff's seizures could be accommodated in a competitive labor market. *See Flanery,* 112 F.3d at 350 (seizure episodes "may not be totally disruptive in a home environment, but could hardly be accommodated in the workplace.").

At the beginning of the hearing, the plaintiff's counsel represented that the issue in this matter was whether the plaintiff's seizure symptoms would require him to frequently miss work or require frequent unscheduled breaks, and whether an employer could accommodate someone who would be consistently absent several times each month. Filing 10-2 at 37-39. The ALJ, however, limited his hypothetical to concerns about the plaintiff's exposure to workplace environmental hazards. Filing 10-2 at 70. The plaintiff's counsel asked the vocational expert to consider a worker with the ALJ's same limitations, but who also would miss either two days or four days per month because of seizures. The vocational expert thought that if the absences were consistent each month, then two or three days off each month is "probably going to lead to an issue" with employers. Filing 10-2 at 72.

"Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported

by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012). The ALJ accepted the fact that the plaintiff suffers from a seizure disorder, and acknowledged that his disorder limited the plaintiff's exposure to certain environmental hazards and precluded him from operating motor vehicles. However, the ALJ's hypothetical did not address the concrete consequences of the plaintiff's grand mal and petit mal seizures, the impact of a seizure occurring while at work, or the plaintiff's capacity to be at work and productive, day in and day out.

### 3. APPOINTMENTS CLAUSE.

The plaintiff raises for the first time on appeal a claim that the ALJ was an inferior officer who, pursuant to *Lucia v. SEC*, 138 S. Ct. 2044 (2018), required appointment by the President, Courts of Law, or the Commissioner.[5] Consistent with *Lucia,* the plaintiff asks that this matter be remanded and that a different ALJ be assigned to determine his claim for benefits.[6] In response, the Commissioner does not dispute (but also does not concede) that Social Security ALJs are inferior officers as opposed to agency employees.

---

[5] The Appointments Clause provides, in pertinent part, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II § 2, cl. 2.

[6] In *Lucia,* the matter was remanded for a new hearing before a different fact-finder. "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." *Lucia*, 138 S. Ct. at 2055.

Instead, the Commissioner argues that the plaintiff waived any claim pursuant to the Appointments Clause by not timely raising the issue at the hearing before the ALJ or to the Appeals Council.

Appointments Clause challenges are deemed to be "in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.*, 501 U.S. 868, 879-80 (1991). On remand, the plaintiff may raise a challenge to the ALJ's appointment if he so elects. It will be up to the Commissioner whether to have the previous ALJ preside, or whether it would be prudent to assign a different ALJ and avoid any later challenge that may arise pursuant to *Lucia*.

## III. CONCLUSION

The ALJ's denial of benefits is not supported by substantial evidence on the record as a whole. This matter is remanded for findings regarding the intensity, persistence, and limiting effects of the plaintiff's seizure condition on his residual functional capacity, with particular consideration given to the plaintiff's capacity "to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tang,* 205 F.3d at 1086.

IT IS ORDERED:

1.  The Clerk of the Court is directed to substitute Commissioner of Social Security Andrew M. Saul as the defendant.

2.  McClinton's motion for reversal of the Commissioner's final decision (filing 13) is granted.

3.    The Commissioner's motion to affirm the Commissioner's final decision (filing 17) is denied.

4.    The Commissioner's decision is reversed.

5.    This matter is remanded back to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Court's Memorandum and Order.

6.    A separate judgment will be entered.

Dated this 18th day of December, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge